# FRIENDS OF CHILDREN, INC. v DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES

## Case No. 83-3130

State of Florida, Division of Administrative Hearings

July 29, 1988

### APPEARANCES OF COUNSEL

**Elizabeth McArthur,** Aurell, Fons, Radey & Hinkle, for petitioner.

**John R. Perry,** Assistant District Legal Counsel, Department of Health and Rehabilitative Services, for respondent.

### OPINION OF THE COURT

P. MICHAEL RUFF, Hearing Officer.

## *RECOMMENDED ORDER ON REMAND*

This cause came before the undersigned Hearing Officer for further proceeding pursuant to a remand by the First District Court of Appeal to the Department of Health and Rehabilitative Services, with the direction that it remand the case back to the Hearing Officer for supplemental findings of fact on certain issues which had been deemed

legally irrelevant by the original Hearing Officer who entertained this proceeding and issued the original recommended order herein.

Friends of Children, Inc., is a private, nonprofit adoption agency, duly licensed by the State of Georgia. This proceeding involves Friends' efforts, since 1983, to obtain licensure as a Florida "child placing agency" from the Department of Health and Rehabilitative Services (HRS). HRS preliminarily denied the Petitioner's licensure application in September, 1983. After a number of lengthy procedural delays, the cause came on for formal hearing, to contest the denial of licensure, in May, 1986 before Hearing Officer R. L. Caleen. Hearing Officer Caleen ultimately issued a recommended order by which he recommended issuance of the license to Friends. In rendering that order, he determined, (as HRS agreed), that Friends had complied with all pertinent regulatory requirements necessary to obtain licensure. He found irrelevant the issues and evidence concerning alleged past, illegal activities by Friends in the business of child placement or adoption and ruled that those alleged, past, illegal activities had no bearing on the issue of whether Friends qualified for licensure in terms of the statutes and rules of the department, which dictate the qualifications which must be met to secure a licensure as a child placing agency. HRS entered a final order thereafter in which it adopted all of the Hearing Officer's findings of fact, except paragraph 17, rejected his conclusions of law, made "supplemental" findings of fact on issues deemed legally irrelevant by the Hearing Officer, mentioned above, and denied the application for licensure. The cause was appealed tó the First District Court of Appeal which reversed and remanded the case, holding that, although HRS had the discretion to reject the Hearing Officer's conclusion of law concerning the legal relevance of certain issues, that HRS should have remanded the case back to the Hearing Officer to make supplemental findings of fact regarding those legal issues, instead of making the findings of fact itself.

The purpose of this remand then is, at the behest of the court, to enter supplemental findings of fact, which will address the issues deemed legally irrelevant by Hearing Officer Caleen in the original recommended order. Conclusions of law and a recommendation will then be entered based thereon. The issues to be addressed have been further delineated by a "Supplemental Stipulation on Remand" filed by the parties in light of the order entered in *Friends of Children, Inc. v Department of Health and Rehabilitative Services,* Case No. BP-124, First District Court of Appeal, March 27, 1987 and of the declaratory judgment entered in *State of Florida Department of Health and Rehabilitative Services v Friends of Children, Inc.,* Case No. TCA85-

7161-WS, United States District Court for the Northern District of Florida, Tallahassee Division, December 23, 1986. Thus the parties have stipulated based upon these two decisions, and the Prehearing Stipulation originally filed in this case on May 16, 1986, as follows:

1. HRS no longer asserts as grounds for denial for licensure the issues resolved in Friends' favor by the Federal Court's decision on the action for declaratory judgment. This disposed of all issues originally raised in the denial of licensure.

2. Still at issue is whether Friends violated the Interstate Compact on the placement of children, Section 409.401 *et seq.* Florida Statutes, in three cases, (a) the S family (b) the M family, from Maryland and Vero Beach.

(c) The Cally L situation.

3. The department asserts that a further issue concerns whether Friends violated Section 63.212, Florida Statutes, as the Statute existed when Friends applied for licensure, by arranging for the sale or surrender of children to Friends for money or anything of value, or whether Friends fell within the then-existing Statutory exception to that prohibition. Based on the prehearing stipulation originally filed in this proceeding and on the fact that the department failed to assert this issue at any prior point in this licensure proceeding, Friends objects to HRS raising this issue at this juncture.

4. Also at issue is whether Friends violated the legislative intent in Section 63.022, Florida Statutes, to protect and promote the well-being of persons being adopted and the natural and adoptive parents.

5. Finally, still at issue is whether in this case such violations as are involved in the above issues, if approved, provide a bases for denial of a Florida Child Placing Agency License to the Petitioners.

Before making findings concerning the issues on remand, delineated above, the original findings of fact, including footnotes, now binding in this proceeding and no longer at issue will be set forth as paragraphs 1-17 below.

### FINDINGS OF FACT

1. FRIENDS is a Georgia nonprofit corporation that is duly qualified to do business in Florida and is licensed in Georgia as a child placement agency; it has engaged in business in Georgia since 1973. (Pet. Exh. 2, p. 5; 1, Tab 1).

2. On June 27, 1983, FRIENDS submitted to HRS' District II office an application for licensure as a child placement agency pursuant to Section 63.202, Florida Statutes. (Pet. Exh. 1, Tab 1)

210

3. As required by 10C-15.53(6), Florida Administrative Code, HRS staff reviewed the application and performed a licensing study for the purpose of determining compliance with the "Minimum Standards for Child Placing Agencies," Rules 10C-15.82 through 10C-15.91, Florida Administrative Code.

4. On July 27, 1983, HRS staff requested additional information from FRIENDS to complete the application: FRIENDS responded on July 29, 1983. HRS sought clarification of FRIENDS' response on August 25, 1983; FRIENDS provided the clarification on September 10, 1983. (Pet. Exh. 1, Tabs 3-6)

5. On September 19, 1983, HRS staff completed its licensing study, which found that FRIENDS satisfied the "Minimum Standards for Child Placing Agencies." Despite this finding, HRS staff proceeded to make "Other Findings," in which they alleged that FRIENDS had operated as a child placing agency in Florida without a license. Solely on the basis of these "Other Findings," HRS staff recommended that FRIENDS' application be denied. (Pet. Exh. 1, Tab 7)

6. On September 21, 1983, the HRS staff recommendation was accepted by John M. Awad, Ph.D., District II Administrator, who advised FRIENDS of HRS' intent to deny the application. (Pet. Exh. 1, Tab 8)

7. In this proceeding, HRS had adhered to its original position and has stipulated that FRIENDS satisfies all of the "Minimum Standards for Child Placing Agencies." These standards govern the HRS substantive evaluation of a child placement agency's program. (see Rule 10C-15.51(2)(c)), Florida Administrative Code, and include assessment of an agency's organization, administration and financing, Rule 10C-15.83; the duties of the Board, including financial responsibilities, Rule 10C-15.84; the character and education of the personnel, Rule 10C-15.85; personnel practices, Rule 10C-15.86; office space and equipment, Rule 10C-15.87; substantive program, Rule 10C-15.88; the appropriateness of the services for the community, Rule 10C-15.89; operating policies and practices, Rule 10C-15.90; and records, reports and statistics, Rule 10C-15.91.[1]

---

[1] Notwithstanding its execution of a prehearing stipulation agreeing that FRIENDS' policies and practices as a child placement agency are "in accordance with the standards of child care, case work, foster and adoption home placement practices adhered to by other recognized and approved child placing agencies, HRS presented evidence attacking the manner in which FRIENDS operates outside of Florida and its compliance with the Interstate Compact for the Placement of Children. Since this was an attempt to deviate from the stipulation, such evidence cannot be used to FRIENDS'

**211**

8. In January 1983, Muriel C. Bryan, Coordinator of the HRS foster care program in District II, was contacted by an adoption counselor in HRS' Gadsden County office advising her that one of the counselor's clients had received a letter from FRIENDS conveying adoption information. The counselor sent a copy of the letter to Ms. Bryan, who does not know who initiated the contact—FRIENDS or the counselor's client. (Testimony of Bryan)

9. After HRS received the letter and telephone information about other possible contacts with people in Florida, it advised FRIENDS, in writing, that FRIENDS was operating as a child placement agency in Florida and should cease immediately until licensed. HRS did not specify what actions by FRIENDS constituted operating as a child placement agency in Florida. (Pet. Exh. 6, 9; Testimony of Bryan, Fulford, Price)

10. FRIENDS responded to the HRS letters in the same general fashion by disagreeing with the HRS position and stating that it was not operating as a child placement agency in Florida. (Pet. Exh. 10, Resp. Exh. 15)

11. At the same time, FRIENDS sought information from HRS in order to apply for licensure in HRS District II. In connection with this effort, HRS staff held two meetings with a representative from FRIENDS in March and May 1983, to review requirements for licensure. At these meetings, HRS staff expressed their concern that FRIENDS was already operating in Florida and doing so without a license. The FRIENDS representative was open and candid in describing the nature of FRIENDS activities in Florida, but stated that his legal staff had advised that such activities did not require a Florida license. (Testimony of Bryan)

12. The activities of FRIENDS which were addressed at these 1983 meetings included advertising in Florida through phone directory listings, providing information letters to prospective parents upon request, offering to perform home studies for a fee to assess the suitability of prospective parents and match them with a child, providing financial aid and counseling to expectant mothers, and advising those mothers and prospective parents of the availability of FRIENDS to receive and place children in Georgia for adoption. (Testimony of Porter)

13. In 1983, HRS took the position with FRIENDS that these

detriment. See, *Gandy v Department of Offender Rehabilitation,* 351 So.2d 1133 (Fla. 1st DCA 1977).

212

general practices constituted child placement, and required a license under Section 63.202, Florida Statutes, which provides that no agency shall place a minor for adoption unless the agency is licensed by HRS.[2] (Pet. Exh. 5) HRS staff deny that, by this memo, they were searching for some reason to deny the application, but the language—considered in light of the ongoing differences between FRIENDS and HRS staff— supports such an inference. (Testimony of Price) However, by internal memorandum, HRS advised that it did not have sufficient grounds to take affirmative action to prevent FRIENDS from continuing its activities in Floria. (Pet. Exh. 12; Testimony of Price)

14. After receiving and reviewing the license application subsequently filed by FRIENDS, the HRS District II staff sent the application to Mary Ann Price at the State Office. They transmitted the application with a memorandum stating:

> We are aware that the State of Florida is quite concerned about this organization obtaining a license anywhere in the State of Florida. However, in reviewing the attached information, we have found they are in compliance with nearly every licensing standard.

> We have until July 27, 1983, to respond to the application. Therefore, we would like for you to review this information and hopefully offer some suggestions.

15. Between 1982 and 1983, HRS took a different position in a similar case involving Children's Services International, a child placement agency also licensed in Georgia, not in Florida. HRS permitted that agency to place children with Florida families pursuant to the Interstate Compact; to conduct home studies in Florida for a fee; to advertise in Florida Phone directories; and to provide information to Florida families upon request. (Pet. Exh. 7; Testimony of Price)

16. Although in 1982, HRS contended that Children's Services International could not engage in such activities, it changed its mind and eventually allowed these activities to continue. In 1982, Children's Services International applied for and was granted a child placement license by HRS. In allowing Children's Services International to continue its prelicensure activities, and in granting the license, HRS did not consider such treatment to be special or exceptional. (Pet. Exh. 7; Testimony of Price)

\* \* \* \*

17. There is no HRS rule or pre-existing policy which purports to

---

[2] At hearing, HRS staff receded, in many respects, from this initial position taken with FRIENDS. (Testimony of Price, Bryan)

authorize denial of a license to an applicant for engaging in child placement activities before obtaining a Florida license. (Testimony of Price)

## SUPPLEMENTAL FINDINGS OF FACT

1. Despite the lack of a rule or policy authorizing the denial of Child Placing Agency Licenses based upon illegal, prelicensure child placement activities, the department chose to preliminarily deny the license application of FRIENDS on that basis in September, 1983. In fact, the department has had a number of reasons for denial of licensure at various stages in this proceeding, not all of which were the same reasons. In September, 1983, with full knowledge of all of FRIENDS' Florida-related activities occurring prior to that time, gained through its prelicensure investigative process, HRS specified the following reasons for denial in its denial letter to FRIENDS:

(1) That various activities such as performing home studies, advertising and providing financial aid and counseling to expectant mothers constituted child placement in Florida for which a Florida license was required under Chapter 63, Florida Statutes, and Rule 10C-15.53, Florida Administrative Code.

(2) That in advising expectant mothers that they could place their children with FRIENDS in Georgia, FRIENDS violated the statutory prohibition in Sections 63.207 and 63.212 against arranging for placement of children out-of-state.

2. Despite the denial letter and the position asserted by HRS before the previous Hearing Officer, to the effect that FRIENDS had engaged in these putative violations, HRS initiated a declaratory judgment action while this proceeding was in progress before the United States District Court for the Northern District of Florida, seeking the declaration that FRIENDS had indeed violated the statutory provisions. The declaratory judgment was issued on December 23, 1986, in *State of Florida, Department of Health and Rehabilitative Services v Friends of Children, Inc.,* Case No. TCA85-7161-WS, by Judge Stafford of that court, in which he held that each reason specified by HRS for licensure denial in the denial letter of September, 1983 were indeed lawful activities. HRS, however, raised additional theories at hearing, in this proceeding, as a basis for the previous alleged child placement activities being unlawful. It also attempts to advance additional theories before the Hearing Officer on this remand which were not espoused at the original hearing in this matter.

3. Thus, by May of 1986 when the matter came on for hearing originally, the parties agreed by prehearing stipulation:

**214**

"The only grounds asserted by Respondent for denial of license are activities previously undertaken by Petitioner that Respondent asserts were illegal."

The parties also agreed by stipulation that Florida law in effect when Friends submitted its licensure application would govern this proceeding. See joint exhibit 1.

4. Since FRIENDS had established through that stipulation that it satisfied all of the standards in the HRS rules by which entitlement to licensure is measured, the department had the burden of going forward with evidence regarding the claimed unlawful activities. The evidence shows that the theories tried by the parties at that hearing were:

(1) That performing home studies, advertising, providing financial aid and counseling to Florida mothers and providing information to prospective parents constituted placement, requiring a Florida license.

(2) That FRIENDS' advice to expectant mothers tht they could place their babies with FRIENDS in Georgia constituted unlawful arranging for out-of-state placement under Chapter 63.

(3) That charging a fee for home study violated the prohibition in Section 63.212 for charging a fee for a referral in connection with an adoption.

(4) That in two instances, one in early 1983 and one in 1985, FRIENDS violated the Interstate Compact for the placement of children, Section 409.402, at et seq, Florida Statutes, because children it was legally responsible for entered Florida without prior approval by Florida's Interstate Compact office.

5. The Hearing Officer's recommended order in this case, of course, determined that the issue of whether the FRIENDS activities were lawful or not was irrelevant as a matter of law because, it having been agreed that FRIENDS was in compliance with all licensure standards in the department's policies and rules, it was entitled to licensure, regardless of the nature of its prelicensure activities. That conclusion of law was rejected in the final order and of course the court has remanded the matter for findings of fact and conclusions of law regarding the nature of those prelicensure activities and their legality. Hence the issue at bar concerns whether those activities were shown to be unlawful by HRS and, if so, whether the circumstances are such that those activities should justify licensure denial.

6. It has now been conclusively determined by Judge Stafford's order that the asserted unlawful activities set forth in the initial denial letter

of September, 1983 were indeed all lawful activities. In May of 1986, at the hearing herein, HRS asserted two additional bases for licensure denial, set forth above as issues number 3 and 4. With respect to issue number 3, regarding charging a fee for a home study, HRS has now conceded that it misread the statute in that particular and has abandoned this issue.

7. Thus based on the issues raised and tried by the parties at the final hearing, issue number 4, quoted above, concerning the two claimed Interstate Compact violations, remains to be considered. In reviewing these two alleged incidents, it must be borne in mind that the first asserted violation occurred in early 1983 before FRIENDS' licensure application was submitted and before the preliminary denial was issued. Despite HRS' full knowledge of this incident, through the investigative efforts of its relevant personnel, it failed to raise this issue originally as a reason for denying a license in the denial letter issued in September, 1983. HRS' staff confirmed, through testimony, that this incident was taken into account and not considered to be grounds for denial at that time. Rather, HRS then took the position that its case turned on the issue of out-of-state placement and alleged violation of Chapter 63 as to the "Cally L case." The federal declaratory judgment, as mentioned above, has now established that no out-of-state placement violation for purposes of Chapter 63 occurred and that FRIENDS' practices in that regard were completely lawful. It must also be kept in mind that the second asserted Interstate Compact violation, allegedly occurring in 1985, occurred during the pendency of this proceeding. The evidence reveals that FRIENDS cannot be faulted for the manner in which the incident involving the "M family" evolved, but rather demonstrates that HRS itself may have caused the so-called "violation" through its refusal to cooperate with FRIENDS and the lawyer retained by the "M family."

8. The 1983 incident referenced above involved the "S family" from St. Augustine. The S family desired to adopt a child and sought to do so through the auspices of FRIENDS. It was understood between both of those parties that FRIENDS was licensed in Georgia and that the placement of the child would occur in Georgia, as well as that Interstate Compact requirements had to be met before the child could be brought to Florida. In fact, two children were located for the S family, who agreed to take them. They met with FRIENDS in Georgia and custody of the children was delivered to the S family in Georgia. The family agreed to keep the children under an executed foster care agreement while the consents for adoption were being finalized and while the Interstate Compact approval process was being completed.

216

9. FRIENDS initiated that Interstate Compact approval process by sending a packet regarding the S family's proposed adoption of the children to Florida's Interstate Compact Office. The S family got impatient however, and despite their written promise not to leave Georgia with the children, contacted both HRS and FRIENDS to ask permission to go to Florida even only for purposes of a "vacation." Both HRS and FRIENDS informed the S family that they could not bring the children to Florida. FRIENDS then advised the S's that a problem had arisen with their consents, and that the children had to be returned, FRIENDS also advised HRS that it need not process the Interstate Compact approval further. Despite the S's knowledge that they would be acting illegally by doing so, they left Georgia with the children and returned to Florida. When FRIENDS learned of this it took steps to have the S's arrested and the children retrieved. Although the S's were not ultimately charged with a criminal violation, the children were retrieved and returned to Georgia to the custody of FRIENDS.

10. The 1985 incident raised by HRS involved the "M family" from Maryland. In that situation, the M family contacted FRIENDS when the M's lived in Maryland and FRIENDS proceeded to arrange for placement of a child with the intent that the child would return with the M's to their home in Maryland. FRIENDS processed and obtained the Interstate Compact approval in Maryland and delivered custody of the child to the M's in Georgia. The placement agreement contained a special provision that in the event the M's moved from Maryland to any other state, including Florida, before the adoption was finalized, that Interstate Compact requirements, if any, would first have to be met at the M's expense.

11. In fact, the M's moved to Florida, without first satisfying the Interstate Compact requirements or having FRIENDS re-process the Interstate Compact request, already submitted to and approved by the Maryland authorities, through Florida's office. Instead, the M's attorney, hired to finalize the adoption in Florida, contacted FRIENDS to seek necessary documents for the adoption proceeding. FRIENDS corresponded with him and stated that it was concerned that the M's had done what they had been told they must not do, that is, move from Maryland to another state, without first complying with the Interstate Compact requirements, as they had agreed to do.

12. The department takes the apparent position that FRIENDS was aware all along that the M's intended to go to Florida, instead of to Maryland, and that FRIENDS wrongfully sought to shift responsibility

**217**

for compliance with the Interstate Compact to the M's. This position is not established by record evidence however. FRIENDS clearly did not make the M's, or the S family in 1983, for that matter, process the Interstate Compact paper work. FRIENDS prepared the requests. It would be illogical for FRIENDS to process a request for placement with the Maryland Interstate Compact authorities, if it did not truly believe that the M's were returning with the child to Maryland. HRS's assertion that there was some deviousness exercised by FRIENDS in attempting to avoid the Interstate Compact adoption process is not borne out by the record, which clearly shows that when they believed that the M family was returning to Maryland with the child in question, that FRIENDS properly processed the Interstate Compact request with Maryland and obtained the approval.

13. Once FRIENDS was advised by the M's attorney that the M's were in Florida, the evidence concerning what transpired in the adoption process after that advice does not support HRS's assertion that FRIENDS was at fault for not bringing that placement into compliance with Interstate Compact provisions. Indeed the failure to bring Interstate Compact approval in Florida to fruition appears partly the fault of HRS itself. HRS's staff candidly admitted that the placement could be brought into compliance, even at the time of the hearing, if the Interstate Compact office had certain documents in its file, which HRS concedes it has never requested. In this regard, FRIENDS had sent an Interstate Compact approval "placement request packet" of documents to Maryland, ultimately obtaining that state's approval of the child placement in question. The Florida Interstate Compact office had obtained that packet. Given the uniform requirements of the Interstate Compact Chapter, it was not unreasonable for FRIENDS to assume that the same packet used by Maryland for approval would suffice for Florida's approval, since the uniform Interstate Compact Placement Statute was in effect in both states.

14. However, while the compact on its face requires the same basic information to initiate requests for placement approvals, in practice, states vary considerably, even from case to case, regarding the procedures they follow and the documents they require. Many states blatantly deviate from the statute's approval requirements. Since the states do vary in practice and, as HRS itself has conceded, it is prudent to check with each state, for each placement, to determine what is required, FRIENDS, on April 30, 1985, made known to Mr. Robert Fulford, of the Interstate Compact Office in Tallahassee, their desire to be contacted by that office concerning procedures they would need to follow to aid Attorney Carter, representing the M family, in complying

with interstate adoption requirements. This request was communicated to Mr. Fulford, of the Interstate Compact Office of HRS, by Attorney Carter in his letter to Mr. Fulford of April 30, 1985. However, despite the general practice followed by HRS of always helping agencies that do not follow Interstate Compact procedures in bringing placements into "after the fact" compliance, Mr. Fulford did not respond to Mr. Carter's and FRIENDS' request. Indeed Mr. Fulford testified that it was FRIENDS' or the Georgia Interstate Compact Office's responsibility to bring the placement into compliance. HRS, however, also ignored the October, 1985 request, with respect to the M family adoption, from the Georgia Interstate Compact Office when it asked that Mr. Fulford's Florida office "let them know what Florida would need to finalize and she will send needs request to FRIENDS OF CHILDREN."

15. Although HRS is concerned over documents missing from its Interstate Compact files with regard to this case, it has never asked for those documents. Mr. Carter, on the other hand, was able to obtain from FRIENDS all the documents that he needed to finalize the adoption. The only witness in this case with personal knowledge of what documents were obtained and filed in the adoption proceeding was Mr. Carter. He obtained all documents necessary to finalize the adoption except for a "clean report" from HRS. The HRS report filed with the Circuit Court in the adoption proceeding was not a "clean" report because it expressed the Interstate Compact Office's concern about non-compliance with that compact by FRIENDS and the Georgia Interstate Compact Office. Notwithstanding this concern, and based on a staff recommendation, HRS, in fulfilling its statutory role in the civil adoption proceeding under Chapter 63, Florida Statutes, recommended that the adoption be finalized because it would be in the best interests of the child involved.

16. HRS now asserts, however, that FRIENDS' actions with regard thereto did not protect the best interest of the mother, child and the adoptive parents (See Stipulation on Remand.) This position is, in effect, directly contrary to the one HRS took with regard to the adoption proceeding in the Circuit Court. In view of HRS's refusal to offer any guidance to FRIENDS regarding what more (beyond that documentation already provided to the State of Maryland, and indirectly Florida) that HRS would require for Interstate Compliance compliance, it is difficult to understand, from the evidence, why FRIENDS is now purported to be in violation of the provisions regarding Interstate Compact approval by failing to have done more to achieve that approval. FRIENDS and Attorney Carter, as well as the

Georgia Interstate Compact Office, sought to do whatever was necessary to achieve Interstate Compact approval and simply could not get HRS' cooperation.

17. Additionally, HRS seeks to raise certain bases for denial of licensure, which were not at issue nor tried by the parties at the hearing. Thus, HRS now asserts, the "Supplemental Stipulation on Remand," the unstipulated position that FRIENDS license should be denied because FRIENDS violated the Interstate Compact provisions as to the "Cally L case" as well. This issue was never addressed in any testimony at hearing and has never been tested by opposing evidence or cross-examination. At the time of the hearing in this matter, the evidence generated concerned the issue of whether the circumstances of the "Cally L case" constituted a violation of the prohibition in Chapter 63, Florida Statutes against out-of-state placement. HRS was aware of and asserted the Cally L case situation as a reason for preliminarily denying the license in 1983, based solely on Chapter 63. No mention was ever made, at the time of the Denial Letter's issuance, of any Interstate Compact violation with regard to the Cally L case. In questioning witnesses regarding the Cally L case, HRS never mentioned the Interstate compact issue and, although it quite clearly felt that Chapter 63 had been violated in terms of out-of-state placement, it never raised the issue of any Interstate Compact provision violation with any witness at trial. In fact, the Federal Court Judgment referenced above has determined, with regard to this situation, that no violation of the prohibition in Chapter 63 against out-of-state placement occurred anyway.

18. The HRS theory regarding a supposed Interstate Compact violation in the Cally L situation apparently involves its belief that FRIENDS violated that law because, if Cally L had taken her baby to Georgia for placement, then the Georgia Interstate Compact approval would have been required. It then assumes that since no evidence has been presented that such approval would have been obtained in that circumstance, that the compact was violated. This conclusion is entirely speculative and illogical since there is no evidentiary basis whatever to show that the baby in question was ever taken to Georgia for placement in the first place. No child was "sent, brought or caused to be sent or brought" to Georgia; hence, there could be no Interstate Compact violation. No witness was ever asked about Interstate Compact processing regarding this case and there is simply no basis for an inference that all necessary approvals would not have been obtained before the child in question was brought to Georgia, if indeed that had ever occurred. Accordingly, the theory of a violation of the Interstate

220

Compact provisions asserted by HRS is based entirely on supposition and conjecture.

19. HRS also has raised as a new issue on this remand, as demonstrated in the Supplemental Stipulation on Remand, and over FRIENDS' objection, that FRIENDS violated Section 63.212, Florida Statutes, as it existed when FRIENDS applied for licensure, by allegedly arranging for the sale or surrender of children to FRIENDS for money or anything of value. HRS has never before, at any point in the proceeding, raised this issue.

20. Be that as it may, the evidence does not establish that there has been any violation of this provision, even had the issue been timely and properly raised. The statute in effect when FRIENDS applied for licensure, stipulated as applicable in this proceeding, provided:

(1) "It is unlawful for any person:

. . .

(d) to sell or surrender or arrange for the sale or surrender of a child to another person for money or anything of value; however, nothing herein should be construed as prohibiting any person who is contemplating adopting a child from paying actual prenatal care and living expenses of the mother of the child to be adopted, nor from paying actual living and medical expenses of such mother for a reasonable time, not to exceed 30 days after the birth of the child." See Section 63.212, Florida Statutes.

21. The record reveals that indeed, in conjunction with adoptions it handles, FRIENDS has provided medical and living expense funds to expectant mothers, and, it is established that in at least the Cally L case, such payments were made in Florida. The agreement pursuant to which such funds were provided established that the money would be repaid unless Cally L placed her baby with FRIENDS for adoption. Since Cally L never placed her child with FRIENDS, there could have arisen no violation. There is no evidence in this record to show any case in which any payments, such as those in the Cally L case, were made in Florida, where the mother subsequently placed her child with FRIENDS and the loan was thereby forgiven. Judge Stafford's Declaratory Judgment holds that FRIENDS may provide financial aid to Florida mothers if the financial aid is provided in Georgia. There is no evidence that financial aid payments made in Florida were ever given as value for the surrender of a child.

22. Even if there had been such an occurrence, the exception to the general statutory prohibition set forth above, allowing such aid to be

221

provided *in connection with an adoption,* would have been applicable, in the event a child had been placed with FRIENDS after financial aid was provided in Florida. HRS takes the position that that exception would not have applied because it only accepts payments made by the adopting person, instead of an agency such as FRIENDS, acting as a conduit or intermediary. Since, during the course of a mother's pregnancy, FRIENDS provides payment itself, as a conduit, off-set by the subsequent payment received from the adoptive parents to reimburse FRIENDS, when the baby is placed with them, HRS asserts that FRIENDS is not exempt from the statutory prohibition against providing such financial support. This position is, however, contrary to the realities of adoption practice in Florida through adoption agencies, as customarily approved by HRS as comporting with its policy. In such situations, babies of expectant mothers are not always assigned to particular adoptive parents from early in the pregnancy, when expenses are being incurred by the mother and when such financial support is needed. This position also is contrary to HRS' own prior approval of this very practice by FRIENDS, clearly set forth in its licensure application and approved, in effect, in HRS' licensing study and investigation regarding the FRIENDS licensure application.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction of the subject matter of and the parties to this proceeding. Section 120.57(1), Florida Statutes and *Friends of Children, Inc. v Department of Health and Rehabilitative Services,* 504 So.2d 1345 (Fla. 1st DCA 1987).

Section 409.401, Florida Statutes, the "Interstate Compact on the Placement of Children" provides in pertinent part, as follows:

"ARTICLE I. Purpose and Policy

It is the purpose and policy of the party states to cooperate with each other in the Interstate Placement of children to the end that: (a) Each child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.

(b) The appropriate authorities in the state where a child is to be placed may have full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with applicable requirements for the protection of the child.

(c) The proper authorities of the state from which the placement is made may obtain the most complete information on the basis on which to evaluate a projected placement before it is made.

(d) An appropriate jurisdiction or arrangements for the care of children will be promoted.

. . . ARTICLE III. Conditions for Placement

(a) No sending agency shall send, bring, or cause to be sent or brought into any other party state any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set for in this article and with the applicable laws of the receiving state governing the placement of children therein.

(b) Prior to sending, bringing, or cause any child to be sent or brought into a receiving state for placement and foster care or as a preliminary to a possible adoption, the sending agency shall furnish the appropriate public authorities in the receiving sate written notice of the intention to send, bring, or place the child in the receiving state. . . ."

The issues as now framed concern the question of Interstate Compact violations for purposes of the above statute in the incidents involving the "S family" the "M family," and the "Cally L case." The issue with respect to the S family concerns whether FRIENDS violated the Interstate Compact when the S family, unexpectedly took the children from Georgia to Florida despite FRIENDS express instructions in the prior agreement not to leave Georgia with the children. The Interstate Compact is violated by one who sends, brings or causes to be sent or brought any child into a receiving state without the approval of that receiving state. See Section 409.401, Articles III. and IV. As is shown by the above discussed evidence and findings of fact, FRIENDS simply did not send or cause any children to be sent to Florida with or without an HRS approval. This incident involving the S family simply can serve as no basis for finding any act with regard thereto done by FRIENDS to be an illegal act or omission and thus this incident provides no reason for denying licensure to FRIENDS in Florida.

The 1985 incident, raised by HRS as a violation of the Interstate Compact statute, involved the "M family" from Maryland. As found above, the M family contacted friends when the M's lived in Maryland and the Petitioner proceeded to arrange for placement of a child in Georgia, to return with the M's to Maryland. The record and the above findings of fact clearly establishes that the Petitioner processed and obtained Interstate Compact approval in Maryland for placement of the child with the Maryland family, while they were in Georgia. That placement agreement contained a special provision that in the

event the M's moved from Maryland to another state before the adoption was finalized that the Interstate Compact requirements as to that other state would have to be met first, at the M's expense. Upon moving to Florida without first satisfying the Interstate Compact requirements or requesting FRIENDS to reprocess the Maryland Interstate Compact compliance through Florida's office, the M's hired an attorney to finalize their adoption in Florida. Upon learning of this turn of events, FRIENDS wrote the attorney and expressed concern that the M's had moved to Florida without complying with Interstate Compact requirements. HRS has taken the position that FRIENDS apparently had some advanced knowledge that that family was going to move to Florida, instead of reside in Maryland with the child and that FRIENDS was wrongfully trying to shift responsibility for compliance with the Interstate Compact to the M family, rather than accepting responsibility itself.

That position is not supported by the record, however, but rather is clearly refuted by the evidence. FRIENDS did not make either the M family or the S family back in 1983 process the Interstate Compact compliance documents and submittals. Rather FRIENDS prepared both requests. It would have been illogical for FRIENDS to have processed an Interstate Compact approval for placement of the child in Maryland if FRIENDS had some advanced knowledge that the M's were not really intending to return to and reside in Maryland. There is simply no proof that FRIENDS engaged in any devious conduct in an effort to avoid the strictures of the Interstate Compact process. Once the Petitioner was advised by the M's attorney that the M's were indeed in Florida, the evidence establishes that FRIENDS indeed made efforts to obtain Interstate Compact placement approval, even though they had already done so for the M family, with regard to the originally requested Maryland placement.

The Respondent has conceded that placement could still be brought into compliance with the Interstate Compact, if certain documents were in its file, which it also concedes may exist, but which have never been requested. FRIENDS sent the Interstate Compact placement request packet to Maryland, had the request approved, and became aware that the Florida Interstate Compact Office was in possession of that packet. Given the uniform requirements of the Interstate Compact law it was reasonable for FRIENDS to assume that the same documents could be used for approval in Florida, as had been used for the Maryland approval. Since the states do vary in practice as to the procedures followed, however, FRIENDS undertook, through Attorney Carter to ascertain what procedures or information the Florida Inter-

224

state Compact Office needed in order to insure that adoption requirements were met in the M case. That request was not answered. HRS also ignored an October, 1985 request with respect to that adoption from the State of Georgia's Interstate Compact Office on behalf of FRIENDS OF CHILDREN. Given the departments refusal to provide any guidance or information to FRIENDS and the Georgia Interstate Compact Office regarding any information it required to complete Interstate Compact requirements, beyond that already provided to the State of Maryland, which was in HRS's possession, and given that FRIENDS made reasonable efforts to comply, of its own volition, with the Interstate Compact statute in this case, the evidence of record, as reflected in the above findings of fact, demonstrates that no violation perpetrated by the Petitioner, with regard to the M case, has occurred.

As shown in the Supplemental Stipulation on Remand, HRS asserts a new position not asserted at hearing, and not the subject of testimony at hearing, concerning the alleged violation of the Interstate Compact Law with regard to the "Cally L case." HRS had asserted the Cally L situation as a reason for preliminarily denying the licensure application back in 1983, based solely on its view, then, that Chapter 63 had been violated regarding out-of-state placement of a child. That question has already been answered by the Federal Court Judgment referenced above, holding that no such out-of-state placement violation occurred or was perpetrated by the Petitioner.

Apparently HRS's theory regarding an Interstate Compact violation stems from its view that, if Cally L had indeed taken her baby to Georgia for placement with FRIENDS, then Georgia Interstate Compact approval would have been required and that no steps had been taken to secure it. The record reveals however that Cally L and FRIENDS never brought, caused to be brought or sent her child to Georgia for placement and thus the feared violation of the Interstate Compact was never triggered.

HRS also asserts another new issue or theory, in the case upon remand, as found above, concerning why the Cally L situation represents a violation of the statutory provisions relating to adoption or child placement by the Petitioner. Thus it asserts that when FRIENDS gave financial aid to expectant mothers in Florida, including Cally L, it violated the statutory prohibition in Section 63.212, Florida Statutes, against surrendering a child for money or anything of value. The department has never before, in this proceeding, raised this issue. The witnesses at hearing was not questioned about this issue nor was any opportunity to cross-examine, or otherwise defend against this issue, afforded the Petitioners at the hearing already held. It was therefore

not before the court either. Thus, HRS should not be permitted to raise this issue and the issue discussed next above, concerning the alleged Interstate Compact violation with regard to the Cally L case, at this point in the proceeding. See *Harry Pepper and Associates, Inc. v City of Cape Coral,* 429 So.2d 97 (Fla. 1st DCA 1983).

Be that as it may, however, it is clear from the evidence of record that no violation of this provision occurred anyway. The statute in effect when FRIENDS applied for licensure, stipulated as applicable in this proceeding, provided:

"(1) It is unlawful for any person: . .

(b) to sell or surrender or arrange for the sale or surrender of a child to another person for money or anything of value; however, nothing herein shall be construed as prohibiting any person who is contemplating adopting a child from paying actual prenatal care and living expenses of the mother of the child to be adopted, nor from paying actual living and medical expenses of such mother for a reasonable time, not to exceed thirty days after the birth of the child." See Section 63.212, Florida Statutes (1983).

The record herein establishes that in connection with adoptions it handles FRIENDS often provides medical and living expense funds to expectant mothers and such payments were made to Cally L. Cally L was to repay the money unless she placed her baby with FRIENDS for adoption, in which event the expense would typically be reimbursed to FRIENDS by the adoptive parents. There is no evidence that the mother subsequently placed her child with FRIENDS, with the result that the loan was thereby forgiven. Judge Stafford's declaratory judgment provides that FRIENDS can legally provide financial aid to Florida mothers, if the aid is provided in Georgia. There is no evidence that financial aid payments made in Florida were ever given as value for the surrender of a child.

Even if there had been such an occurrence, the exception to the general statutory prohibition set forth above, allowing such aid to be provided *in connection with an adoption,* would have been applicable, in the event the child had been placed with FRIENDS after financial aid was provided in Florida. The department takes the position that the exception would not apply because it only accepts payments made by the adopting person himself or herself. Since, during the course of a mother's pregnancy, FRIENDS would provide the payments itself, as a conduit, offset by the subsequent payment received from the adoptive parents when they receive the baby, HRS maintains that under that scenario FRIENDS would not be exempt. This position ignores the

226

realities of adoption practice, where babies of expectant mothers are not always allocated to particular adoptive parents from early in the pregnancy, when the mother nevertheless is incurring expenses. This position is also contrary to the approval by HRS's own staff of this very practice on the part of FRIENDS itself, which had been clearly revealed in its licensure application and approved by the relevant staff of HRS in the course of its conduct of a licensing study concerning FRIENDS application. The inconsistency of the HRS position is perhaps best understood by considering its interpretation of the 1983 statuted, quoted above, in light of the current statute on the same subject matter, which was construed by Judge Stafford in the declaratory judgment referenced above. The current statute provides the same general prohibition as the 1983 version, but the exception now reads as follows:

"If a child is being adopted by a relative within the third degree or by his step-parent, or is being adopted through the Department of Health and Rehabilitative Services, an agency, or any intermediary, nothing herein can be construed as prohibiting the person who is contemplating adopting the child from paying the actual prenatal care and living expenses of the mother of the child to be adopted, nor from paying the actual living and medical expenses of such mother for a responsible time, not to exceed 30 days, after the birth of the child." See Section 63.212(1)(d), Florida Statutes.

"Agency" is defined for purposes of Chapter 63, unless the context otherwise requires, as a Florida licensed child placing agency. In his declaratory judgment, Judge Stafford held that FRIENDS would violate this current statutory prohibition if it gave financial aid in Florida to Florida expectant mothers contemplating placement. He held the exception inapplicable to FRIENDS *only because* FRIENDS was not licensed in Florida. Indeed under his ruling Florida licensed agencies would not violate this provision, although a narrow construction might be argued to suggest (as HRS does), that they would violate the statute because they are not "the person who is contemplating adoption." However, a more responsible interpretation of both the old and new versions of this statutory provision is that, if the financial aid is limited to the matters set forth in the statute, is made in the context of an adoption process, and is ultimately paid or reimbursed by the adopting parents, then the exception would apply. This interpretation is born out and approved in *In Re: The Matter of the Adoption: Sherman M. Brod v The Matter of an Adoption,* 1 F.L.W. 793 (Fla. 2d DCA March 23, 1988), which clearly indicates that an agency or intermediary, including even an attorney, may make such expense

payments without violating the statutes quoted above. The 1983 statute would apply the exception involved in the context of any adoptions, while the current statute would limit the exception, as found by Judge Stafford, to only those adoptions made to or through the enumerated person or entities, which is a distinction without a difference in this case because the Petitioner comports with the definition of "agency" and thus still comes within the limits of the exception in the latest version of the statute.

In fact, this last interpretation also comports with the staff investigative study and findings made by HRS's staff which noted:

"According to Friends of Children, the mother is offered services and aid unlike those available from most other agencies. Their services include medical care, usually by a Board Certified Gynecologist and a private hospital paid for by Friends of Children, supportive counseling, clothes, food, and, if necessary, housing—all of which is usually paid for by Friends of Children.

These practices by FRIENDS were cited with approval in the staff prelicensure study and, moreover, HRS stipulated in May of 1986 that FRIENDS' operating practices and policies are in conformity with those of duly licensed agencies." See Rule 10C-15.90, Florida Administrative Code.

Now, however, HRS is apparently contending that payments made even from a Florida licensed agency, would be impermissible because such payments can only lawfully be made *directly* by the adopting parents in the above discussed situation. This interpretation is directly contrary to Judge Stafford's opinion, as well as to the opinion in *Brod, supra.*

In conclusion, it is obvious that the record is not supportive of the department's assertion of unlawful activities on the part of the Petitioner. Since the Petitioner admittedly satisfied all regulatory licensure standards, but for these issues concerning past illegal activities, which have now been proven not to have occurred, it is therefore

RECOMMENDED that the Department of Health and Rehabilitative Services issued a Child Placement Agency License to FRIENDS OF CHILDREN, INC.

DONE AND ENTERED this 29th day of July, 1988, in Tallahassee, Leon County, Florida.